IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| ERNEST A. THOMAS, | * | |
|---|---|---|
| Plaintiff, | * | |
| v. | * | Civil Action No. PX-18-00175 |
| WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, | * | |
| | * | |
| Defendant. | | |

\*\*\*\*

## MEMORANDUM OPINION

Pending before the Court is Defendant Washington Metropolitan Area Transit Authority ("WMATA")'s motion for summary judgment.[1] ECF No. 15. The motion is fully briefed, and no hearing is necessary. *See* D. Md. Loc. R. 105.6. For the following reasons, summary judgment is denied.

**I.  Background**

Plaintiff Ernest A. Thomas ("Thomas") has worked at WMATA since he was first hired as an electrical mechanic in 2005. ECF No. 1 at 6; ECF No. 19-3 ¶ 6. Thomas was eventually promoted to Senior Vehicle Engineer. ECF No. 19-3 ¶ 6. Thomas, a black male originally from Liberia, is trained and educated in engineering. ECF No. 15-4; ECF No. 15-6 at 7:18–8:4. This discrimination case arises from WMATA's decision to not promote Thomas to the position of

---

[1] Although Thomas submits a pleading at ECF No. 20 entitled "Cross Motion for Summary Judgment," he confines his argument to refuting the propriety of WMATA's summary judgment motion by "demonstrat[ing] to the Court that there are genuine issues of material fact . . . that preclude the entry of judgment of a matter of law." ECF No. 20 at 1; *see also* ECF No. 20-1 at 14 ("[T]here is a genuine issue of material fact, which could lead a rational trier of fact to find for the Plaintiff, and Defendant is not entitled to Summary Judgment as a matter of law."). Accordingly, the Court will construe Thomas' "motion" as instead an opposition to summary judgment as to all remaining claims.

1

"Manger, Operations Training" ("the position" or "Training Manager") in the summer of 2017. ECF No. 1 at 10.

On May 19, 2017, WMATA posted an announcement for the Training Manager position. ECF No. 15-2 ¶ 4. This position, classified as one in the engineering department, is responsible for creating and administering technical training programs for WMATA employees. ECF No. 15-9 at 1–3; ECF No. 19-9 at 15:16–17. To apply for the position, applicants first submitted resumes online. *See* ECF No. 19-9 at 5:9–18; ECF No. 19-10 at 6:4–7. WMATA Human Resources ("HR") Recruiter, Marcus Washington, then reviewed these resumes to determine if the applicants were "minimally qualified." ECF No. 15-2 ¶ 7; ECF No. 19-9 at 5:19–6:13. According to WMATA's job posting, an applicant is minimally qualified if he or she has either (1) "[g]raduat[ed] from an accredited college or university with a bachelor's degree in Engineering, Engineering and Technology, Transportation Management, or related field" and has at least eight years' experience "in maintenance, engineering, or technical management with specific experience that includes training and supervision," or (2) has "an equivalent combination of post high school education, industrial or vocational training" plus 12 years' experience "in maintenance, engineering, or technical management with specific experience that includes training and supervision." ECF No. 15-9 at 4.

Washington evaluated 86 applicants, nine of whom, including Thomas, were deemed "minimally qualified." ECF No. 15-2 ¶¶ 6-7; ECF No. 19-10 at 6:8–11. Washington forwarded the nine applicants' resumes to the hiring official, Joseph Robinson. ECF No. 15-2 ¶¶ 3, 7. Robinson, as the hiring official, decided which candidates to interview from the pool of minimally qualified applicants. ECF No. 19-9 at 6:16–19. Robinson attests that he evaluated the applicants' resumes for experience in training and management of training programs, knowledge

2

of the construction and maintenance of railroad systems, and management experience more broadly. ECF No. 15-2 ¶ 10. He based his decision of whom to interview solely from the information included in the applicants' resumes. ECF No. 15-2 ¶¶ 12, 15; ECF No. 19-10 at 6:11–12. Robinson then decided who to hire from the interviewed applicants. ECF No. 19-10 at 6:13–16.

Ethel Roy is WMATA's Director of Talent Acquisition. ECF No. 15-6 at 12:1–5. Roy explained that the Talent Acquisition Department, a subdivision of the HR Department, is responsible for the "managing and oversight" of the recruitment process. ECF No. 19-9 at 10:22–11:2. Although Robinson remained the "ultimate decision maker" as to hiring for individual positions, *see id.* at 10:11–13, 11:3–4, according to Roy, Talent Acquisition recruiters may attend interviews and review the hiring manager's "selection document[s] . . . for thoroughness and the like" and "[i]f there's any question or anything along those lines, the appropriate parties are engaged," *id.* at 7:14–18, 12:1–7.

On June 16, 2017, Thomas emailed Roy to ask about the status of his application. ECF No. 19-5 at 6. Ten days later, Roy informed Thomas that WMATA had decided "to proceed with a first round of candidates whose resumes demonstrate current relevant training experience before considering additional candidates, such as yourself, who meet the minimum qualifications but whose relevant experience may be less current." ECF No. 19-5 at 4. Roy also told Thomas that as of June 26, "the department has not yet commenced interviews" for the position and that Thomas' application remains pending. *Id.* Roy maintains that the information she communicated to Thomas "was supplied to [her]," possibly through an HR recruiter, although she does not remember by whom. *See* ECF No. 19-9 at 22:22–23:5.

Robinson testified, however, that he did not evaluate the resumes based on the recency of relevant experience, as Roy described. ECF No. 19-10 at 21:7–14. Robinson further confirmed that he never spoke with Roy about the status of Thomas' application. *Id.* at 20:14–20. In fact, by the time Roy responded to Thomas, WMATA not only had completed the interview process, but had hired a Caucasian man, Christopher DiFatta, for the position. ECF No. 15-3 at 1–2; ECF No. 19-3 ¶ 11.

Robinson attested that the selection of DiFatta occurred as follows: Robinson invited five of the nine minimally qualified applicants to interview, two of whom declined. ECF No. 15-2 ¶¶ 8–9. Thomas was not among the invitees. *Id.* Three WMATA employees, including Robinson, conducted the interviews. ECF No. 15-3 at 1; ECF No. 15-2 ¶¶ 16–18. The interviewers used an "interview script" and ask each interviewee a standard template of questions. ECF No. 19-9 at 7:19–8:3. Each interviewee was scored based on the interview. *See* ECF No. 15-3 at 1. DiFatta received 126 points and was ranked as "exceeds expectations." *Id.* The other two interviewees received scores of 91 and 83 and were ranked as "d[id] not meet requirements." *Id.*

DiFatta and Thomas' education and experience differ in material ways. Thomas earned his bachelor's degree in mathematics from the University of Liberia in 1977, a master's degree in electrical engineering from the Illinois Institute of Technology and a postgraduate certificate in power system engineering from General Electric. ECF No. 15-4 at 1. For 20 years, Thomas worked as an instructor in the field of electrical engineering at the University of Liberia. *Id.* at 3. He has taught in the United States at DeVry University in Pennsylvania. *Id.* Also, for about 20 years, Thomas designed and managed "telecommunication systems" as well as the "development and expansion of electric power distribution systems" at Liberia Telecommunications

Corporation and the Liberia Electricity Corporation. *Id.* at 2. During his time at WMATA, Thomas taught a course on railcar maintenance, which was so well received it became part of the mandatory curriculum for all engineers and engineering managers in WMATA's Office of Chief Vehicle Engineer. *Id.*

DiFatta, on the other hand, was not educated as an engineer. ECF No. 19-10 at 9:11–14.; *see* ECF No. 15-3 at 7. DiFatta, a high school graduate, briefly attended the Community College of Baltimore County in 2005. ECF No. 15-3 at 7. DiFatta has spent 12 years working in the railroad industry. *See id.* at 5–7. While employed at North American Rail Solutions from 2004 to 2010, his job duties included investigating accidents, inspecting machinery, and managing and overseeing railway workers. *Id.* at 6–7. From 2010 to 2012, DiFatta next worked for Amtrak as a Document Control Specialist/Material Specialist. *Id.* at 6. DiFatta then went briefly to work at Alstom, where he planned and coordinated "supplier activities." *Id.* Then DiFatta moved to Bombardier Transportation in 2013, where he worked as a Trainmaster and "[c]oordinat[ed] commuter rail movement" with dispatchers. *Id.* In 2015, Bombardier promoted to DiFatta to the position of Manager of Training and Regulatory Compliance, where he was responsible for creating and administering a "training program in accordance with regulatory and contractual requirements." *Id.* at 5. DiFatta next accepted a consulting job at the Boyd Canton Group in 2016 and was there until WMATA hired him in June 2017. *Id.* At the Boyd Canton group, DiFatta "review[ed] organization staffing and training for operations functions at rail transit agencies," among other consulting-related tasks. *Id.*

Robinson has proffered three reasons why he chose not to interview Thomas. ECF No. 15-2 ¶ 11. First, Robinson noted errors in Thomas' resume, to include misspelling "North Carolina" as "North Caroline," and listing interest in a position at WMATA different than the

5

one under consideration. *Id.*; *see* ECF 15-4 at 1. To Robinson, these errors reflected Thomas' lack of attention to detail and failure to tailor his resume to the open position. ECF No. 19-10 at 34:10–35:2. Notably, however, DiFatta's resume includes similar typographical and grammatical errors, and is likewise not tailored to the relevant position. ECF No. 15-3 at 5–7 ("Responsibilities include *investigated* [sic] accidents . . . , *demonstrated* [sic] use of safety equipment." (emphasis added)); *Id.* at 6 (stating DiFatta's "objective" is "[t]o achieve a position with a growing *company* that will allow [him] to utilize [his] skills in Transportation to initiate change and growth within the organization." (emphasis added)).

Second, Robinson asserts that Thomas was not selected because of his "very limited classroom training and training management experience." ECF No. 15-2 ¶ 11; ECF No. 19-10 at 27:11–16. Thomas' prior experience at WMATA's was confined to the Vehicle Engineering Department, whereas the open position would encompass the entirety of WMATA's Rail Department. ECF No. 15-2 ¶ 11; ECF No. 19-10 35:12–19. Robinson viewed Thomas' prior teaching experience at the University of Liberia, as "simply teaching," and not managing a program. ECF No. 19-10 at 28:5–9.

Third, Robinson points to Thomas' stated experience as a "Car Equipment Instructor" as concerning. ECF No. 15-2 ¶ 11; ECF No. 19-10 at 29:13–18. According to Robinson, all employees by this title report to him. ECF No. 15-2 ¶ 11; *see* ECF No. 19-10 at 29:15–30:7, 32:10–16. Because Thomas did not do so and was not in Robinson's department, Robinson inferred that Thomas overstated his qualifications in this respect. ECF No. 15-2 ¶ 11; *see* ECF No. 19-10 at 29:15–30:7, 32:10–16. Robinson acknowledged in his deposition, however, that Thomas could have occupied this position at a time in which he would not have directly reported to Robinson. ECF No. 19-10 at 31:16–32: 9–16.

As to DiFatta, Robinson attests that he selected DiFatta based on his experience as a Manager of Training and Regulatory Compliance at Bombardier and his experience at the Boyd Canton Group. ECF No. 19-10 at 15:10–17. Robinson also noted that DiFatta, as Trainmaster, handled "all aspects of a train transit environment." *Id.* at 15:18–16:2.

Shortly before Thomas applied for the Training Manger position, he had lodged a discrimination complaint against his third-level supervisor, Sachit Kakkar, in February 2017. ECF No. 15-8 at 11:10–12:3; ECF No. 19-3 ¶ 20. In the previous complaint, Thomas alleged that Kakkar created a hostile work environment in that Kakkar refused to respond to Thomas' greetings and "turned away with a frown" when Thomas walked passed him. ECF No. 19-3 ¶ 21. WMATA, according to Thomas, took no action against Kakkar and has instead refused to hire Thomas for this and other WMATA positions.[2] *Id.* ¶¶ 21, 23. Thomas believes that since lodging the complaint, WMATA has continued to retaliate against him by refusing to hire him for other positions. ECF No. 19-3 ¶¶ 22–23, ¶¶ 30–31. Robinson maintains that he had no knowledge of Thomas' prior EEO activity. ECF No. 15-2 ¶¶ 12–13, 15.

On August 16, 2017, Thomas complained about this non-selection to WMATA's Office of Equal Employment Opportunity ("EEO"), asserting that WMATA discriminated and retaliated against Thomas on account of his race, national origin, and age. ECF No. 15-7 at 1; ECF No. 19-5 at 2. The EEO declined to open a formal investigation on either claim. ECF No. 15-7 at 1.

Thomas next filed a formal charge of discrimination with the EEOC on the same grounds. ECF No. 15-5 at 1. On October 23, 2017, the EEOC dismissed the charge and issued

---

[2] Although the Complaint is a bit confusing as to whether Thomas brings a hostile work environment claim in this case, Thomas clarifies in his pleadings that he "did not make the allegation of a hostile work environment a Count of the complaint," and rather Thomas intended to refer to the underlying allegations only to "support Plaintiff's overall complaint of retaliation." ECF No. 19-1 at 19; *see also* ECF No. 1 at 10–17.

7

Thomas a right-to-sue letter. *Id.* at 2. Thomas timely filed suit in this Court under Title VII and the ADEA, again alleging discrimination based on race, national origin, and age, as well as retaliation for his prior EEOC complaints. ECF No. 1 at 4, 10–17. This Court granted WMATA's motion to dismiss Thomas' age discrimination claim. ECF No. 8 at 3–5. The parties engaged in formal discovery and now dispute the propriety of summary judgment as to all remaining claims. ECF Nos. 15, 19, 20.

**I.     Standard of Review**

Summary judgment is appropriate when the Court, construing all evidence and reasonable inferences in the light most favorable to the non-moving party, finds no genuine dispute exists as to any material fact, thereby entitling the movant to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see In re Family Dollar FLSA Litig.*, 637 F.3d 508, 512 (4th Cir. 2011). Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In responding to a proper motion for summary judgment, the party opposing summary judgment must present evidence of specific facts from which the finder of fact could reasonably find for him or her." *Venugopal v. Shire Labs.*, 334 F. Supp. 2d 835, 840 (D. Md. 2004), *aff'd sub nom. Venugopal v. Shire Labs., Inc.*, 134 F. App'x 627 (4th Cir. 2005) (citing *Anderson v. Liberty Lobby,* 477 U.S. 242, 252 (1986); *Celotex,* 477 U.S. at 322–23). That said, at the summary judgment stage, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

Because Thomas is proceeding pro se, the Court construes his pleadings liberally to ensure that potentially meritorious claims survive challenge. *See Hughes v. Rowe*, 449 U.S. 5, 9 (1980). However, the Court cannot ignore a pro se plaintiff's clear failure to allege facts setting forth a cognizable claim. *See Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 391 (4th Cir. 1990) ("The 'special judicial solicitude' with which a district court should view such pro se complaints does not transform the court into an advocate. Only those questions which are squarely presented to a court may properly be addressed." (quoting *Beaudett v. City of Hampton*, 775 F.2d 1274, 1277 (4th Cir. 1985))).

## II. Analysis

### A. Counts I and II: Race and National Origin Discrimination

WMATA argues that it is entitled to summary judgment because Thomas can neither demonstrate his *prima facie* case nor prove pretext. The Court considers each argument separately.

Pursuant to Title VII, an employer may not refuse to hire a qualified individual based on his "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Because Thomas has not marshalled any direct evidence of discrimination, his failure-to-promote claims are subject to the burden-shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 278 (4th Cir. 2000). Under *McDonnell Douglas*, a plaintiff must first establish a *prima facie* case of discrimination. *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 268 (4th Cir. 2005). In the failure to promote context, a plaintiff must specifically show: (1) he is a member of a protected group, (2) he applied for the position in question, (3) he was qualified for that position, and (4) the defendant rejected plaintiff's application under circumstances that give rise to an inference of

9

unlawful discrimination. *Id.* at 269. A plaintiff generally satisfies his burden on the fourth element when he shows that the open position was filled by a person outside of the plaintiff's protected group. *Carter v. Ball*, 33 F.3d 450, 458 (4th Cir. 1994); *Gbenoba v. Montgomery Cty. Dep't of Health & Human Servs.*, 209 F. Supp. 2d 572, 576 (D. Md. 2002), *aff'd*, 57 F. App'x 572 (4th Cir. 2003).

If Thomas establishes this *prima facie* case, the burden shifts to WMATA to offer a "legitimate, non-discriminatory reason" for failing to promote him. *Anderson*, 406 F.3d at 268. If WMATA provides such a reason, the burden then shifts back to Thomas to raise a genuine issue of material fact as to whether the defendant's proffered reason is a mere pretext for discrimination. *Id.*; *Holley v. N.C. Dep't. of Admin.*, 846 F. Supp. 2d 416, 428–29 (E.D.N.C. 2012). "A plaintiff alleging a failure to promote can prove pretext by showing that he was better qualified, or by amassing circumstantial evidence that otherwise undermines the credibility of the employer's stated reasons." *Heiko v. Colombo Savings Bank, F.S.B.*, 434 F.3d 249, 259 (4th Cir. 2006). The court must "assess relative job qualifications based on the criteria that the employer has established as relevant to the position in question." *Id.* That said, plaintiffs are not required to show that they are "better qualified" to prove pretext. *Dennis v. Columbia Colleton Med. Ctr.*, 290 F.3d 639, 648 n.4 (4th Cir. 2002); *see also Gbenoba*, 209 F. Supp. at 577. When an employer gives inconsistent justifications for why it failed to hire or promote an employee, this is also, "in and of itself, probative of pretext." *E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846, 852–53 (4th Cir. 2001); *see also Dennis*, 290 F.3d at 646–47.

Although the framework "involves a shifting back and forth of the evidentiary burden, Plaintiff, at all times, retains the ultimate burden of persuading the trier of fact that the employer discriminated in violation of Title VII." *Venugopal*, 334 F. Supp. 2d at 841. "The crucial issue

in a Title VII action is an unlawfully discriminatory motive for a defendant's conduct, not the wisdom or folly of its business judgment." *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 383 (4th Cir. 1995); *see also Propst v. HWS Co., Inc.*, 148 F. Supp. 3d 506, 528 (W.D.N.C. 2015) ("[I]t is not the Court's province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for" the adverse action) (quoting *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)) (internal alterations omitted).

The parties do not dispute that Thomas is a member of a protected class and that he was qualified for the position. *See* ECF No. 15 at 7; ECF No. 15-1 ¶¶ 1–3; ECF No. 19-1 at 10–11. WMATA, however, contests the fourth element of Thomas' *prima facie* case. ECF No. 15 at 7. WMATA more particularly maintains Thomas cannot prove that the circumstances surrounding his non-selection gives rise to an "inference of unlawful discrimination" because no evidence suggests DiFatta is white. *Id.* But the record indisputably reflects that DiFatta *is* white. And Thomas, who met DiFatta in person, could confirm as much for the jury, as could DiFatta if called to testify at trial. ECF No. 15-6 at 9:21–10:5; ECF No. 15-9 ¶¶ 5, 11. This alone, when viewing the evidence most favorably to Thomas, cannot support granting summary judgment in WMATA's favor. *Carter*, 33 F.3d at 458; *Gbenoba*, 209 F. Supp. 2d at 576.

WMATA next contends that Thomas has generated no evidence to support that its non-selection of Thomas is pretextual. ECF No. 15 at 7–10. WMATA emphasizes that Robinson, as the selecting official, viewed Thomas' experience as lacking in training and management. ECF ECF No. 15 at 7–8; *see* ECF No. 15-2 ¶ 11; ECF No. 19-10 at 27:11–28:19. Robinson's stated reasons for non-selection, however, are not wholly supported by the record. Thomas rightfully points out that his relevant education surpasses DiFatta's. ECF No. 19-1 at 8, 12. Thomas is a highly educated engineer with a bachelor's degree in mathematics, a master's degree in electrical

engineering, and a post graduate certificate in power systems engineering. ECF No. 15-4 at 1–3. DiFatta, by contrast, is a high school graduate who briefly attended community college. *See* ECF No. 15-3 at 5–8. Thomas also spent 20 years training engineers at the University of Liberia. ECF No. 15-4 at 3. Thomas also held managerial positions for 20 years between his time at the Liberia Telecommunications Corporation and the Liberia Electricity Corporation and assumed training responsibilities at WMATA. ECF. No. 15-4 at 2–3. From this, a reasonable factfinder could conclude that Robinson's stated reasons for non-selection are pretextual. *Heiko,* 434 F.3d at 259. This is especially so where WMATA undervalued Thomas' Liberian-based experience, which is inextricably tied to Thomas' race and national origin.

Additionally, although Thomas does not explicitly argue this point, the Court also notes that WMATA did not simply choose DiFatta over Thomas, but rather declined to even give Thomas an interview. This is especially concerning when considering that the other interviewees were rated as substantially less qualified than DiFatta. ECF No. 15-3 at 1. Accordingly, a reasonable finder of fact could conclude that Robinson's decision to not even allow Thomas a fighting chance at competing for this position in earnest supports that his non-selection was motivated by discriminatory animus.

Finally, WMATA's inconsistent explanation for its adverse treatment of Thomas supports an inference of discrimination. ECF No. 19-1 at 7, 11. Roy, as the head of Talent and Acquisitions and tasked with reviewing this hiring process, told Thomas that WMATA had established two groups of interviewees based on recency of training experience, which appears to be simply untrue. ECF No. 19-5 at 4; ECF No. 15-2 ¶ 12; ECF No. 19-10 at 20:14–20, 21:7–14. Roy also misrepresented to Thomas that interviews for the position had not begun and that Thomas' application remained "pending" even though interviews had concluded and a candidate

12

chosen. ECF No. 15-3 at 1–2; No. 19-5 at 4. A reasonable trier of fact could conclude that Roy lied to Thomas in an effort to hide WMATA's actual discriminatory motivate for not selecting Thomas, which is "in and of itself, probative of pretext." *Sears Roebuck & Co.*, 243 F.3d at 852–53; *Dennis*, 290 F.3d at 646–47.

Robinson's additional reasons for not selecting Thomas fare no better. Thomas underscores that although Robinson correctly pointed out errors in Thomas' resume, DiFatta's resume is equally problematic. ECF No. 15-3 at 5–7; ECF No. 19-1 at 5, 11; ECF No. 19-3 ¶ 18. Yet Robinson declines to interview only Thomas on this basis.

Similarly, Robinson's view that Thomas exaggerated his qualifications is belied by the record. Although Robinson attests that he did not believe Thomas worked as a Car Equipment Instructor at WMATA because Thomas did not report to Robinson while he was acting in that capacity, Thomas likely worked in that position before Robinson started supervising those instructors. ECF No. 15-2 ¶ 11; ECF No. 19-10 at 29:13–30:7, 31:16–32:16. From this, a reasonable trier of fact could conclude that WMATA's stated reasons for not selecting Thomas were pretext for racial and national origin discrimination. Accordingly, WMATA's motion for summary judgment is denied as to Counts I and II.

**B. Retaliation**

The Court next turns to Thomas' retaliation claim. An employer may not refuse to hire an applicant on account of his prior protected activity. 42 U.S.C. § 2000e–3(a). To sustain a retaliation claim under the *McDonnell Douglas* framework, the plaintiff must demonstrate: (1) that he engaged in protected activity; (2) the employer took an adverse employment action against him; and (3) a causal link exists between the two. *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010). "[E]stablishing a 'causal relationship' at the *prima facie* stage is

not an onerous burden," *Strothers. v. City of Laurel*, 895 F.3d 317, 335 (4th Cir. 2018), and "very little evidence of a causal connection is required," *Burgess v. Bowen*, 466 F. App'x 272, 282 (4th Cir. 2012); *see also Karpel v. Inova Health Sys. Servs.*, 134 F.3d 1222, 1229 (4th Cir. 1998) ("Although [plaintiff] presents little or no direct evidence of a causal connection between her protected activity and [defendant's] adverse action, little is required."). No requirement exists, for example, to prove retaliation was the "but for" cause of the adverse action. *Foster v. Univ. of Md.-E. Shore.*, 787 F.3d 243, 251 & n.13 (4th Cir. 2015) (holding that *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013) did not alter proof under *McDonnell Douglas*). The plaintiff may prove a causal link by pointing to "inconsistent reasons by the employer for the adverse action," *Jaudon v. Elder Health, Inc.*, 125 F. Supp. 2d 153, 165 (D. Md. 2000), "continuing retaliatory conduct," or temporal proximity between the protected activity and the adverse action, *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007). A causal link is more likely to exist when the employer "engages in retaliation upon its 'first opportunity to do so.'" *Sewell v. Strayer Univ.*, 956 F. Supp. 2d 658, 672 (D. Md. 2013) (quoting *Templeton v. First Tenn. Bank, N.A.*, 424 F. App'x 249, 251 (4th Cir. 2011)); *see also Hinton v. Va. Union Univ.*, 185 F. Supp. 3d 807, 838, 840 (E.D. Va. 2016) (applying "first opportunity" reasoning to retaliatory disparate treatment and harassment claims); *Johnson v. Scott Clark Honda*, No. 3:13–CV–485–RJC–DCK, 2014 WL 1654128, *4 (W.D.N.C. Apr. 25, 2014) (applying "first opportunity" reasoning to retaliatory failure to promote claim).

WMATA first contends that Thomas' *prima facie* case fails because Robinson—the primary decisionmaker—did not know about Thomas' EEO activity. ECF No. 15 at 11. However, because sufficient evidence exists to demonstrate that Talent and Acquisitions, and

Roy as its head, possessed such knowledge, Thomas has generated sufficient evidence from which a reasonable juror could disagree.

Thomas argues primarily that Roy, as the department head, participated directly in his non-selection, to include feeding Thomas misinformation about the interview process. ECF No. 19-1 at 14–15. The record reflects that a Talent Acquisition recruiter "guide[ed] the hiring manager through the process" to assure adherence to WMATA policy. ECF No. 19-9 30:20–31:11. Talent Acquisition also retained the authority to review the hiring manager's selection. *Id.* at 12:1-7. Finally, Thomas attests that Talent and Acquisitions knew of his prior activity. ECF No. 19-3 ¶ 34.

Moreover, the close temporal proximity between his EEO activity and WMATA's failure to promote him provides further evidence of unlawful retaliation. ECF No. 19-1 at 16. Thomas filed his initial EEO complaint in February 2017 and was not selected for the Training Manager position in June 2017. This fact, in combination with other evidence, could lead a reasonable fact finder to determine that WMATA indeed took the "first opportunity" it had to retaliate against Thomas for engaging in protected EEO activity. *See Sewell*, 956 F. Supp. 2d at 672; *cf. Pascual*, 193 F. App'x at 233 (four months insufficient to establish causal connection by temporal proximity alone).[3]

In short, Thomas can meet the less than "onerous burden" of proving a causal connection at the *prima facie* stage, *Strothers*, 895 F.3d at 335 (4th Cir. 2018); *Burgess*, 466 F. App'x at 282; *Karpel*, 134 F.3d at 1229, and the Court further finds that, as with the discrimination claim, a reasonable finder of fact could conclude that WMATA's stated reasons for non-selection were

---

[3] Thomas also avers that because Robinson had Thomas' "flow report form" which is found in an employee's personnel file, a factfinder could infer that Robinson likewise had access to Thomas' entire personnel file. ECF No. 19-1 at 14–15; *see* ECF No. 15-3 at 3. However, nothing else in the record supports this inference.

pretextual and articulated to conceal that WMATA did not promote Thomas on account of his recent EEO activity. Thus, WMATA's motion for summary judgment is denied on this ground as well.

## III.  Conclusion

For the reasons stated in this Memorandum Opinion, WMATA's motion for summary judgment is denied. A separate Order follows.

<u>12/4/2019</u>                                           <u>                 /S/                    </u>
Date                                                              Paula Xinis
                                                                       United States District Judge